### SMITH v. SMITH.

*(Common Pleas of New York City and County, General Term.    April 6, 1891.)*

1. CREDIBILITY OF WITNESS.

   The willful false-swearing of a witness in one particular does not absolutely discredit his entire testimony; but the whole is to be submitted to the court or jury to determine, by the ordinary tests of veracity, whether and how far they may believe him.

2. DIVORCE—EVIDENCE OF ADULTERY.

   In an action for divorce upon the ground of adultery committed within a specified time, evidence of the improper relations and conduct of the parties anterior and subsequent to the time charged is admissible and material to show an adulterous intent.

3. SAME.

   The plaintiff and defendant, in an action for divorce, were married in 1879. In 1886 they became acquainted with the co-respondent, who attached himself to them as an inmate of their family, and accompanied or followed them in a number of moves to different quarters of the city. Defendant frequently called on co-respondent, representing herself as a relative, and was received by him privately. Thereafter she engaged rooms for co-respondent and herself, representing herself as his wife, and remained in the room with him nearly every day, with the door closed and locked, and was seen with him undressed in the room. Finally co-respondent addressed to her a letter, in which he says, among other things, "there can be no resuming the past life you and I have led." *Held*, that the evidence was sufficient to sustain the charge of adultery.

Appeal from judgment on report of referee.

Action by Albert W. Smith against Julia M. Smith to obtain a divorce on the ground of adultery.

Argued before DALY, C. J., and BISCHOFF and PRYOR, JJ.

*Wm. O. Campbell*, for appellant.    *W. W. Ladd, Jr.*, for respondent.

PRYOR, J.    The complaint accuses the defendant of committing adultery with Edward Barstow on divers occasions between the 1st day of June, 1886, and the 14th day of October, 1888; but the referee finds the fact of the adultery only "between the middle of March, 1888, and the 1st of September, 1888, at No. 137 West 16th street, in the city of New York." On the argument the single contention of the appellant was that "the evidence does not support such finding." With equal earnestness and ingenuity

counsel for appellant endeavored to discredit the evidence of the witnesses upon whose testimony the referee found the fact of adultery; but the question of credibility as affected by the relations, character, manner, and motives of the witnesses, and by the inconsistency or improbability of their story, is peculiarly for solution by the trial court. *Devlin* v. *Bank*, 26 N. E. Rep. 744, (Feb. 24, 1891, Ct. App. N. Y.) Discrepancies in the story of witnesses are not necessarily fatal to the effect of their evidence; for, as observed by a celebrated writer, "the usual character of human testimony is substantial truth under circumstantial variety." Nor is it the rule in this state that even the willful false-swearing of a witness in one particular, as matter of law, discredits his entire testimony; but his evidence is to be submitted to the court or jury to determine, by the ordinary tests of veracity, whether and how far they may believe him.

Before passing to the consideration of the evidence in support of the referee's conclusion, another observation is necessary. Counsel for the appellant rejects, as irrelevant and ineffectual, the "much testimony given with regard to the relations of the defendant and the co-respondent," not in immediate connection with the specific act of adultery found. But, "as showing the adulterous intent, it is competent to give in evidence the defendant's improper familiarities with the alleged *particeps criminis* at times anterior to the fact charged, at times concurrent with the fact, and at times subsequent thereto." 2 Bish. Mar. & Div. § 625; 1 Amer. & Eng. Enc. Law, 214. And in 2 Greenl. Ev. § 47, it is said that, "where the fact of adultery is alleged to have been committed within a limited period of time, it is not necessary that the evidence be confined to that period; but proof of acts anterior to the time alleged may be adduced in explanation of other acts of the like nature within that period. * * * So, where one act of adultery was proved by a witness, whose credibility the defendant attempted to impeach, evidence of prior acts of improper familiarity between the parties has been held admissible to corroborate the witness." Direct evidence of adultery being rarely attainable, the problem with courts has been to distinguish the circumstances that are significant of the fact, and to assign to them their legitimate probative force; and while the law does not prescribe arbitrarily the character or the quality of proof requisite to establish the offense, it recognizes certain facts as importing its commission, and the concurrence of which suffices to produce a conviction of guilt. Upon these facts, and their efficacy as proof, a writer of the weightiest authority has framed the formula: "That every act of adultery implies three things: *First*, the opportunity; *secondly*, the disposition in the mind of the adulterer; *thirdly*, the same in that of the *particeps criminis*. Whenever these three concur, the criminal fact is committed; so that to prove the three is to prove the fact itself." 2 Bish. Mar. & Div. § 619. And that the coincidence of inclination and opportunity affords satisfactory proof of the fact of adultery is abundantly exemplified in adjudged cases, *e. g.*, *Van Epps* v. *Van Epps*, 6 Barb. 320; *Soilleux* v. *Soilleux*, 1 Hagg. Const. 373. Testing by this canon the sufficiency of the evidence in the case at bar to sustain the referee's finding, it will be seen that the proof is not only ample, but conclusive.

1. As to opportunity: The plaintiff and the defendant were married the 19th of June, 1879. They had no child. In 1886, while boarding in West Eleventh street, city of New York, they became acquainted with Barstow, then a widower, and living in the same house. Later in the year the plaintiff and the defendant moved to Brooklyn, but Barstow accompanied them, and became an inmate of their family. In the autumn of 1886 plaintiff and defendant returned to this city, and made their abode in a flat in Madison avenue; and here, too, Barstow resided, occupying a hall bedroom in the flat. For several weeks of their sojourn in this house Barstow was practicing typewriting in the house; and the defendant admits that he was there almost all

day at times, while the plaintiff was down town at his business. In the spring of 1887 Mr. and Mrs. Smith moved to a boarding-house at 217 West Eleventh street, and Barstow went to Waverly place, two or three blocks away. The Smiths then moved to Abingdon square, where they remained until about 1st of May, 1888, when they took rooms at 281 West Fourth street. Barstow left Waverly place in the fall of 1887, went first to Eighth street, and thence to Mrs. Negrin's, 223 West Fifteenth street, where he remained till the spring of 1888, when he moved to 137 West Sixteenth street. On October 13, 1888, plaintiff left his wife. At that time they were living at 281 West Fourth street, and Barstow at 146 West Twenty-Second street. In the summer and fall of 1887, when the Smiths were in West Eleventh street, and Barstow in Waverly place, he and Mrs. Smith were often together, frequently in her room; and on one occasion, when taking leave of her, he was seen to kiss her. She called at Barstow's room, and represented herself as his sister. When Barstow occupied rooms in West Fifteenth street, which he did from October, 1887, to April, 1888, the defendant visited him frequently, as his sister; at least two or three times a week, coming in the afternoon, about 3 or 4 o'clock. All this time they were very affectionate towards each other. In January, 1888, and at other times, Barstow and Mrs. Smith were seen walking arm in arm, and, when so recognized, exhibited much confusion. The defendant admits that while she was living in West Eleventh street Barstow was in the habit of going there very often, and that he also visited her very often when she resided in Abingdon square. In March, 1888, the defendant engaged rooms for Barstow at Mrs. Ward's boarding-house, 137 West Sixteenth street; and when she did so she gave her name as Mrs. Barstow, and represented that her husband would call later. On the same evening they both returned. Barstow chose a larger room, and they were left alone in it. When she took the rooms she stated that she would be there only in the day-time, as her mother was an invalid. Mrs. Smith had a key to this house. She called there nearly every day, and would remain with Barstow in his room, the door closed and locked. She always spoke of him as her husband, and he of her as his wife. He often left on his bureau a slip of paper, addressed to her as his "wife," and informing her where he had gone, and when he would return. When she called latterly she avoided seeing any one as she came in, and would shun people in the hall. Between May and October, 1888, in her husband's absence, Barstow's visits to her were regularly kept up. She described Barstow to the servant, and directed him to be sent up to her room, but to deny her to all other callers.

2. As to the illicit feeling reciprocated between the defendant and Barstow, it is already apparent; but the evidence to the point is clear and convincing. As early as 1886 she was lending him money without her husband's knowledge. In March, 1887, she told a witness that Barstow did not care for her sister or Miss Lotta, but that he did care for herself; that he was very nice to wait on her, and would do anything for her she wanted. From October, 1887, to April, 1888, at Mrs. Negrin's, they were very affectionate, and passed for brother and sister. In January, 1888, they were frequently out, walking arm in arm; and from March to August, 1888, she repeatedly called on Barstow in his rooms at Mrs. Ward's, and was received and treated by him as his wife, and she always spoke of him as her husband. When he was about leaving the house, she came there in the morning, and insisted on going up to his room to see if he slept there the night before. During this period Mrs. Smith and Barstow were in correspondence, and the witness was instructed by her not to let her husband see any letters she might receive from Barstow. If, however, any doubt remains as to the guilty passion of these people, it is dissipated by the letter in evidence. Barstow, it seems, is announcing to her his resolution to break off the connection. A few excerpts will suffice to reveal the pervading tone of the communication: "MY ONLY LOVE: I will reply

to your last letter as frankly as I can.   What you wrote me was tender and affectionate.   I appreciate every word of it, and will say right here that there is no change in my feelings towards you, nor will ever be as long as I live, but there can be no resuming the past life you and I have led, at least not now.   *   *   *   As for you, I can only say this:  You can lose nothing of me that you already possess, except through your own acts.   *   *   *   You have done and said nothing but what was faithful, true, loving, and abso- lutely devoted to me.   *   *   *   One word in conclusion in regard to your- self:  Ever since I have known you, I have had nothing but good.   If we ever meet again it will be your province to say.   If we do, the same leaping heart and passionate love (and all that this implies) will greet you.   Your life-long EDWARD."   If this were all of the case, no rational mind could resist the conviction of a carnal intercourse between these persons.   But the evidence points to the fact of adultery, almost as unequivocally as if the par- ties were surprised in the very act.   After Barstow and the defendant had been shut up in his room, as already indicated, the bed, which had been made up before they went into the room, was found disarranged, as if some one had lain in it; and, again, she was found in his room nearly or wholly un- dressed, and Barstow coming from the bath-room with a pitcher of water. On 4th of October, 1888, he called at her house in the morning, went up to her room, she being alone, and they shut themselves in.   When he went in, she had on a dark skirt and waist; when he came out she wore a light wrap- per,—plainly showing that she had undressed while he was in the room. When he left they threw kisses at each other.   On the 13th of the same month the plaintiff discovered them in a situation so compromising that even the fond incredulity of a doting husband could no longer doubt, and he aban- doned her forever.   Finally, we have in their clandestine and confidential cor- respondence his avowal of the adultery to her; for what else mean the ex- pressions, "there can be no resuming the past life you and I have led, at least not now," and "if we meet again, the same leaping heart and passionate love (and all that this implies) will greet you?"   If, then, as the court of appeals declare, (*Allen* v. *Allen*, 101 N. Y. 658, 5 N. E. Rep. 341,) "no different standard of judgment applies to the conviction of adultery in a civil action from that which ordinarily guides the conclusions of intelligent and consci- entious men," the learned referee could have drawn from the evidence no other inference than the guilt of the appellant.   Judgment affirmed, with costs.   All concur.