## AULD *v.* AULD.

*(Superior Court of New York City, Special Term.* October Term, 1891.)

1. DIVORCE—ADULTERY—SUFFICIENCY OF EVIDENCE.

In an action against the wife for divorce on the ground of adultery, the evidence showed that defendant, having left her husband and gone to the country to spend the summer, invited one P., who was her lover before she married, to visit her; that she met him at the depot, kissed him, and took him to her boarding-house; that while there she at times occupied the same hammock with him, and allowed him to hug her; that she frequented his room, and permitted him to frequent hers, during the day and night, on one occasion when she was partially undressed; that she went riding with him; that she allowed him to accompany her to the door of the water-closet; that they corresponded with each other, using endearing terms, and destroyed the letters and telegrams which passed between them. After one of her visits to P.'s room her hair-pins were found in his bed. In one of P.'s letters he stated that they were better "at covering their tracks" than a certain other woman. Defendant also furnished envelopes to P., addressed to her under an assumed name, which he used in writing to her. He introduced her on a number of occasions as his cousin, and once as his wife. One witness testified to having seen them in bed together. *Held,* that the evidence warranted a finding that defendant was guilty of adultery.

2. SAME.

In such action defendant charged that plaintiff was afflicted with a venereal disease, and communicated it to her; but the charge was denied by plaintiff, who testified that he had never had such disease, and never committed adultery, though he had had blood poisoning. A doctor who had examined plaintiff's person, and diagnosed his case, testified that he was unwilling to swear that plaintiff had ever had venereal disease. *Held,* that the evidence did not warrant a finding that plaintiff had committed adultery.

3. SAME—CONDONATION.

A wife, in a suit by her husband for divorce, cannot complain that plaintiff was afflicted with a venereal disease, and communicated it to her, if she voluntarily cohabited with him after believing the fact, since she thereby condoned the offense.

Action by Robert Auld against Isabella Auld for divorce. Judgment for plaintiff.

*George E. Coffin,* for plaintiff. *J. E. Ludden,* for defendant.

McADAM, J. The action is for divorce on the ground of adultery. The answer denies the charge, and sets up adultery on the part of the plaintiff. Each side asks for a divorce against the other. The evidence discloses a pain-

---

ful case of marital infelicity. The parties intermarried March 22, 1882, at the city of New York, and one child has been born of the marriage, named Isabella, who is now of the age of six years. The parties cohabited peaceably together for some years, when, owing to certain differences, they separated. They became reconciled, and again cohabited until about April, 1890, when they separated finally. The plaintiff charges that between the 17th of July and the 27th of July, 1891, at a farm-house kept by one Decker, at or near Dentons, Orange county, N. Y., the defendant committed adultery with one Lyman A. Pickens, familiarly called "Al." Pickens; and that subsequently, and between the 27th of July, 1891, and the commencement of the action, she also committed adultery with Pickens at a boarding-house kept by Mrs. Shawcross at Bellvale, Orange county, aforesaid.

Without reciting the evidence in detail, it is sufficient to say that the defendant went to these places and spent the summer, and while there Pickens joined her, boarding at both places during most of the time the defendant remained there. Pickens went to Orange county on the invitation of the defendant; that is to say, he met her in the street. She told him where she was going. He asked her if he might join her. She said, "Yes," and he went. Telegrams passed between them, and on Pickens' arrival at the station the defendant met him. He put his arms around her and kissed her, and she took him to the house where she boarded. While in the house they exhibited great fondness for each other, showed marked intimacy, visited each other's rooms, lay in the hammock together, and the one was seldom out of the company of the other. They frequently rode out together, and on all occasions, excepting one, he introduced the defendant as his cousin, and on that exceptional occasion as his wife. To summarize the acts of undue familiarity with Pickens, they may be grouped together in this way: Going to the depot to meet Pickens; kissing him on his arrival; accompanying him to the boarding-house; occupying the same hammock with him; allowing him to hug her while in the hammock; frequenting his room and permitting him to frequent her room during the day and night, on one occasion while she had on a sleeveless vest, corsets, and underskirt; going out riding with him; allowing him to accompany her to the door of the water-closet; corresponding with him; destroying the letters and telegrams sent by him to her and by her to him; finding her hair-pins between the sheets of Pickens' bed after one of her visits to his room; and dressing his sore leg,—are all circumstances corroborating the more direct evidence which appears in the case that adultery was committed. One of the letters sent by Pickens to the defendant was found by the husband in her pocket, (this was before the final separation,) and in that letter Pickens, referring to a certain female, used this significant language: "I do not think she is as good at covering her tracks as we are." The husband, on becoming possessed of this letter, naturally became indignant. The wife begged forgiveness, and, after a great deal of persuasion and delay, he returned the letter to her, and she destroyed it. Before returning it he made a copy of the letter, and Pickens testified it was a substantial copy of the original. While the intimacy which existed between Pickens and the defendant prior to that time may have been forgiven by the subsequent cohabitation of the parties, the significant declaration as to "covering their tracks" still lives as pertinent evidence bearing on their subsequent conduct. It is also significant that Pickens should have taken the liberty of writing letters, using endearing terms, to a married woman, which she never rebuked or complained of; on the contrary, actually invited, because she furnished him envelopes bearing the name of Mrs. Mary Buckley, under cover of which he was to carry on his evil work. These circumstances tend to throw light on what occurred afterwards, and lend corroboration to the charge made.

Married women should not only avoid evil, but the appearance of it, and if, by their course of conduct with other men, they give color to charges of

misconduct, and commit acts of indiscretion and impropriety which tend to evidence them, they must not complain if the public draw the conclusion which seems inevitable, that the marriage vows have not only been forgotten, but broken. Pickens frequently visited the house where the husband resided, during the husband's absence, and without his knowledge, and frequently met the defendant in the streets without the husband's knowledge or consent. Pickens repeatedly introduced the defendant as his cousin. When asked to explain why he did this, he said, "To avoid talk. He was afraid of inviting talk, because she was a married woman." Pickens introduced the defendant "as his wife" to Farmer Burt, and, when asked to explain this, said "that was to give the professional town gossips something to talk about." He afterwards told Burt that the defendant was not his wife, but his "cousin." That she was a widow. The defendant admits that these statements were made to Burt. She says she wanted Pickens to correct his first story, which he did by saying the defendant was his cousin; after he did so, the defendant said "cousin" was better. The defendant also says she admitted to Burt that she was a widow, for she did not want it known that she was separated from her husband. It seems passing strange that the defendant should be introduced as Pickens' "cousin" to avoid talk, and next as "his wife" to give the "professional town gossips something to talk about." These inconsistencies, followed by the falsehoods as to being a "widow," and "Pickens' cousin," are suggestive of something radically wrong in their relations. So, throughout the case, the facts link one after another in harmony, while falsehoods clash discordantly one with the other. The following evidence given by Pickens bears upon the question of his relations with the defendant: "*Question.* What did you mean by the phrase, 'covering up our tracks better than Lizzie?' *Answer.* Why, just when we would meet each other and take a walk the people would talk about it, and we would have to walk where people would not see us. *Q.* Why did you put yourself in that position? *A.* I only met Mrs. Auld accidentally when I did meet her. I would meet her occasionally on the street, and would walk a few blocks, and people would talk about it because they knew I went there previous to Mrs. Auld's marriage. *Q.* And why was it that you addressed your letters in an envelope directed to Mrs. Buckley? *A.* Because I could not very well direct them otherwise. *Q.* Was it done with the consent of the husband? *A.* Not at all. *Q.* And isn't it a fact that all your intercourse with her since her marriage has been surreptitious,—concealed from him? *A.* Yes; what little we have had. *Q.* You sent a telegram to Bellvale, didn't you? *A.* Yes. *Q.* What did you say in it? *A.* I forget." The following evidence, given by the defendant, relates to the same subject: "*Question.* What was the object in having Mr. Pickens address you by a fictitious name? *Answer.* I didn't want too many letters coming to me in my own name. *Q.* Did you know you were doing wrong then? *A.* Certainly; I knew I was doing wrong. *Q.* What did you do it for? *A.* What! You have often done wrongful, and knew that you did it. I didn't feel condemned about it until afterwards. When you are caught you feel condemned. *Q.* When I am caught? *A.* When I was caught I did. *Q.* So you were caught? *A.* Yes; I admit it." These are frightful statements for a single man and married woman to make respecting their conduct; certainly not such as straightforward people, honest and fair in their intercourse, would ever be willing to have known. When Pickens was asked why he destroyed the letters which the defendant sent him, he said that he did so because "it was a wise precaution; he had been bit before," and did not propose to be bitten again. This was shocking. Indeed Pickens' conduct on the stand demonstrated clearly that he was a man in whose keeping no woman's honor was safe.

These various circumstances, grouped together, show undue familiarity between Pickens and the defendant, and demonstrate that they acted the part of

husband and wife without holding that sacred relation. While marriage is, in a sense, a civil contract, it is a relation divinely ordained, out of which flow the brightest anticipations, the purest affections, and tenderest memories. Indeed, it is the cornerstone of the social edifice, and the stranger who intrudes himself upon it, and by his conduct breaks up the home of a married couple, commits a crime against society that merits the highest censure possible to pronounce. The witness Morris testified that he saw the defendant in Pickens' room one evening in July, 1891; that she pinned the curtains together, and Pickens unpinned them, and put out the light; and that all was quiet after that. The witness McCarthy testified that he saw the defendant and Pickens in bed together. While his testimony, standing alone, would be entitled to but little credit, he is corroborated in many of the details of his evidence by other witnesses,—a circumstance which adds weight to his testimony. In short, the evidence satisfactorily shows the defendant "was caught," that "the tracks" referred to by Pickens were not sufficiently covered, and that Pickens, in spite of his purpose "not to be bit again," has been again discovered. Respectable married women, accurate in their deportment, need not be afraid of "town talk" or "professional town gossipers." Their lives and their conduct give the lie to every insinuation of impropriety. Actions often speak louder than words, and are as well, if not better, understood, even by Orange county boarding-house keepers. Talk or gossip, corroborated by acts of the parties impugned, giving color to them, soon takes wings, and often flies further than even the author contemplates. Married women should so live that the electric light of truth, when turned upon them, will reveal nothing but honor and purity. Such women have nothing to fear. The charge of adultery is one easy to make; difficult to prove. It must be proved by evidence clear, positive, and satisfactory; yet, being a crime of darkness and secrecy, wherein the parties are rarely surprised, it may, and ordinarily must, be proved by circumstantial evidence. 2 Bish. Mar. & Div. § 613. The evidence of the different witnesses from Orange county, where the acts were committed, and the circumstances before referred to, are all consistent with the theory of the defendant's guilt. Indeed, all the links consistently and firmly join together in making out a solid chain sustaining the charge made. Circumstances, standing alone, amount to but little; but where additional facts exist in the same case, giving rise to additional presumptions against the accused, though individually of the same slight kind, a chain or body of evidence begins to form, and, from the mere circumstance of the concurrence or coincidence of such presumptions, bearing upon one point or in one direction, and materially aiding each other, they acquire a force and weight eventually sufficient, not only to shift the burden of proof, but in some cases to amount to proof of the most convincing kind. Burrill, Circ. Ev. 65. The object of criminative evidence is to form such a chain, in which each circumstance or link shall be in its proper place, and all, taken together, shall connect the crime with the criminal, in the most effectual and satisfactory manner. Id. 179. With respect to the comparative weight due to direct and presumptive evidence, it has been said that circumstances are in many cases of greater force and more to be depended on than the testimony of living witnesses, inasmuch as witnesses may either be mistaken themselves or wickedly intend to deceive others; whereas, circumstances and presumptions naturally and necessarily arising out of a given fact cannot lie. Per MOUNTENEY, B., *Annesley* v. *Lord Anglesea*, 9 St. Tr. 426, 17 How. St. Tr. 1430. It may be observed that it is generally the property of circumstantial evidence to bring a more extensive assemblage of facts under the cognizance of a jury, and to require a greater number of witnesses, than where the evidence is direct, whereby such circumstantial evidence is more capable of being disproved, if untrue. 3 Benth. Jud. Ev. 251. Circumstantial evidence must be acted on cautiously, and rash inferences should not

be drawn, but those irresistibly flowing from the circumstances are entitled to great weight, and have the force of evidence. Circumstances give rise to presumptions, and these in turn are proof. In *Rex* v. *Burdett*, 4 Barn. & Ald. 161, ABBOTT, C. J., said: "A presumption of any fact is properly an inference of that fact from other facts that are known; it is an act of reasoning, and much of human knowledge on all subjects is derived from this source. A fact must not be inferred without premises that will warrant the inference; but, if no fact could be thus ascertained by inference in a court of law, very few offenders would be brought to punishment." A presumption of fact is a logical argument from a fact to a fact; or, as the distinction is sometimes put, it is an argument which infers a fact, otherwise doubtful, from a fact which is proved. Hence a presumption of fact, to be valid, must rest on a fact in proof. Presumptions, therefore, in this sense, are to be regarded rather as among the effects of proof than as proof itself. Whart. Ev. § 1226. In this case the inferences following fact after fact established by the evidence all lead to but one result, and that of guilt. In such a case the proof is entirely satisfactory. In *Smith* v. *Smith*, (Com. Pl. N. Y.) 13 N. Y. Supp. 817, it is said that every act of adultery implies three things: *First*, opportunity; *second*, inclination on the part of the defendant; *third*, inclination on the part of the *particeps criminis*. In applying the rule to this case, the form of the prosposition may be appropriately changed as follows: *First*, opportunity; *second*, Pickens' motive and purpose; *third*, whether the defendant reluctantly or otherwise yielded thereto. Pickens' motive and purpose were clearly illicit, opportunity favored, the defendant yielded, and the crime was complete. Pickens' conduct is highly reprehensible. He was the bone of contention in most of the difficulties between the plaintiff and his wife. He was her first love, and when she married another he should have remained away and not intruded his presence on the family circle, and particularly upon the wife during the husband's absence. He had no right to carry on a secret correspondence with her, complimenting each other on their adroitness; had no right to address letters to her in endearing terms; and had no right to take liberties which none but a husband should think of doing. He has, in my judgment, completely destroyed whatever friendly relations existed between husband and wife, and has been the means of breaking up their home, and of bringing scandal and disgrace upon two worthy families. That the wife permitted it is matter of deep regret, and it must be to the families concerned.

The defendant charges that prior to the final separation in 1890, to-wit, in 1888, the plaintiff was afflicted with venereal disease, and that he communicated it to her. The plaintiff denies that he ever had the venereal disease or ever committed adultery. He admits he had blood poisoning, which his doctor testified might arise from many things besides venereal disease. The doctor also testified that he made a careful examination of the plaintiff, and diagnosis of the case, and went so far as to examine his person, and was unwilling to swear that the plaintiff had ever been afflicted in that manner. Such evidence would not warrant a finding of adultery by the plaintiff. *Homburger* v. *Homburger*, 46 How. Pr. 346; *Ferguson* v. *Ferguson*, 3 Sandf. 307. Whether he was so afflicted becomes of very little importance in the decision of this case, because it is clear that, if so afflicted, it was in 1888, and the wife voluntarily cohabited with him long after that, which is clear proof of condonation, which, in effect, wiped out the offense, if it ever existed. "Condonation is presumed from cohabitation. It may be express or implied." "The true import of the rule, in my opinion," said PARSONS, C. J., (Anon., 6 Mass. 147,) "is, the cohabitation of the wife after the commission of the offense, and after she believes, on probable evidence, the guilt of her husband, is conclusive evidence of the remission." The evidence offered on the part of the defendant clearly shows that, whether the plaintiff

had venereal disease or not, the wife believed he did have it, and, having co-habited with him after such belief, the evidence respecting condonation is conclusive. The court regrets exceedingly to have to pass such strictures upon the conduct of individuals, particularly where a female is concerned, and would rather say to both of the parties litigant: "Go, and sin no more." But the law gives the husband, who has been wronged, certain means of re-dress, of which divorce is one, and no court has the right to arbitrarily with-hold legal remedies from an injured husband or wife without their consent and against their will. It follows that there must be judgment in favor of the plaintiff, dissolving the marriage between the parties, and awarding the custody of the child to the plaintiff.