KEVILLE v. KEVILLE.

(Supreme Court, Appellate Division, Second Department. November 22, 1907.)

DIVORCE—ADULTERY—DEGREE OF PROOF.

In an action for divorce for adultery, evidence *held* insufficient to sustain a decree for plaintiff, under the rule that a charge of adultery must be established by clear and convincing evidence.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 17, Divorce, §§ 411–441.]

Appeal from Special Term, Kings County.

Action by Elizabeth L. Keville against Peter E. Keville for divorce. From an interlocutory judgment, and from a final judgment in favor of plaintiff, defendant appeals. Reversed on the law and the facts.

Argued before HIRSCHBERG, P. J., and WOODWARD, GAYNOR, RICH, and MILLER, JJ.

Thomas Kelby, for appellant.
Harry E. Lewis, for respondent.

GAYNOR, J. The complaint alleges and the learned trial judge finds that the defendant committed adultery in his own house in August, 1904, and in April, 1905. The woman named was the servant of the household, which consisted of the plaintiff and the defendant and their two grown children, son and daughter.

It is not permissible to make a finding of adultery on such evidence as this case presents. "Charges of this kind are only to be established by clear and convincing evidence; they are so serious in their character, and the results so grave, that a court should hesitate before making a finding of guilty except when thoroughly satisfied of the truth of the charge." Smith v. Smith, 89 Hun, 610, 35 N. Y. Supp. 556. The law and policy of this state is to preserve the stability of the marriage tie, and release from it only on safe and sound evidence.

The plaintiff went away on summer vacation at the beginning of July, 1904. She took the son and daughter with her, and left the defendant at home alone with the accused servant girl. She remained away until the end of August. A woman who was living next door and taking care of the house (Mrs. Bauer's) for the summer was the witness called by the plaintiff to prove the alleged adultery in August.

106 N.Y.S.—63

Her story is as follows: She says she heard noises in the defendant's house through the brick party wall of the two houses, i. e., persons talking in the back parlor. There was an extension on the rear of each house. The tin roof of it was just under and up close to the rear parlor windows. This roof was continuous along the rear of both houses. She says she thought this noise was of burglars, and went along this roof to look in. She had often heard talking in the house before in July and August but never looked in before or afterwards, or told any one of her belief that it came from burglars. In fact she knew well that the house was not unoccupied, but was occupied by the defendant and the servant. She used to see him going and coming morning and evening often, and saw and talked with the girl. And yet she says that when people leave their houses unoccupied in the summer burglars come, as a token of the reality of her belief. She went along the extension roof from the window of the rear parlor she was in to the window of the defendant's rear parlor. It was between 6:30 and 6:45 p. m. The window was down, the shade inside nearly down and the outside blinds closed. She crouched down low and peeked through the slats of the blinds and under the inside shade. She is near sighted, and has to wear glasses to get along at all. "I heard them through the brick wall, so then I went out on the back piazza" (roof of the extension) "to see the robbers, and I say I looked in the parlor window," is her version in her own words. She says she saw the servant girl lying on her back on the floor in the middle of the rear parlor with her skirts pulled up about her. She saw that the girl had on a dark skirt and a white waist. The defendant was standing up with his trousers open. She continued to peek at them continuously five or ten minutes, and this is all she saw. They remained in the same position and condition all the while. Counsel for plaintiff, deeming the length of time she gave and adhered to as extravagant, tested her on it, watch in hand, telling her to begin at the drop of his finger and tell him when the time was up. At the end of a minute and a half the trial judge interrupted the monotony of her silence by asking her if the time she was looking through the window had expired, and she said "Yes." Her cross-examination was interrupted by adjournment to the next day. On its continuance then she said she was not in the rear parlor of the Bauer house when she heard the talk in the rear parlor of the defendant's house, but out on the extension roof washing the windows, and went along the roof and peeked. On the first day she said that she knew the plaintiff, that she had seen her going in and out of her house. The next day she said she knew the plaintiff lived there, but did not know her and had never seen her. On the first day she said she came to live in the said house next door about July 1st; on the next she changed it to May 1st. She said she once saw the defendant kiss the servant in the back parlor; afterwards she said she never saw him kiss her, but heard it through the party wall between her room and the said servant's room, the two rear hall bed rooms on the top floor. She says repeatedly that it was in August that she peeked and saw. She does not waver in this, and she says it was about the middle of August, as near as she can fix it. The date she cannot give. She says that after this

occurrence she saw the defendant go out in the morning and return in the evening for two or three weeks, which she afterwards gives as three weeks, which would be well into September. But it was proved by indisputable evidence for the defendant, including the steamship passenger list, that he sailed for Europe on August 13th, and was in his house the last time the day before. If she saw him going in and out for two or three weeks after the occurrence, it could not have occurred in August. She says she did not tell her husband, nor the mother of the mistress of the house in her care, who was living there with her, of the occurrence. She says she told the said mistress (Mrs. Bauer) on her return home early in September, her mother having died the last of August. She did not tell the facts, however. "I just said to Mrs. Bauer, there is something going on next door, I don't think it is quite right, and she told me I had better mind my own business, so I shut my mouth, I did not say any more."

Such is her story with its contradictions and improbabilities. The feat of leaning her head down to the roof and seeing between the slats of the closed blinds through the closed window and under the inside shade, which was almost down, a woman with a dark skirt and white waist over in the middle of the room, with her skirts pulled up about her, and a man standing by with his trousers open, instead of seeing burglars, as she expected, is incredible enough in itself; but when we consider that the man and the woman that she saw had been living alone in this three-story house, with four bedrooms with beds, in addition to the servants' bedroom, for six weeks, during which time she says she heard them kissing through the wall in the servants' bedroom, and they were, according to the plaintiff's theory, lodging together nightly, her story that they should be found in the back parlor in the position she describes is so improbable as to be unworthy of belief. It cannot be accepted without running the gravest risk of wronging the defendant, to say nothing of the contradiction of it by the fact that the defendant was not at the house after August 12th. Even if the defendant and the servant had not denied her evidence, its contradictions, extravagance and improbability would cause hesitation if not revulsion.

Two other witnesses were called, one an old woman vegetable pedler who says that in August she saw the defendant come out of his house by way of the stoop two mornings as he was leaving for the day, and at the same time the servant come out by way of the basement door, and the two meet outside in the court or areaway and embrace with their arms and kiss on one of the mornings, while she stood right by them. The other morning she says she heard the servant say to him: "I meet you about 2 o'clock over in New York." The other was a street sweeper, who says he also "occasionally" saw the same, i. e., the defendant come out by the front stoop and the servant at the same time come out by the basement and there they would kiss good-bye in the view of any one happening by or looking across the street or from the adjoining houses. This is a most improbable tale of a man and a woman, who, it is claimed, lodged together in adultery and ate together in this house. After lodging together all night, and eating breakfast together in the morning, we are asked to believe that

instead of parting inside they would go out into the front of the house, he by the stoop and she by the basement, to kiss good-bye for the day in the presence of neighbors, pedlers and street sweepers.

And the wife of this same street sweeper is called to prove the adultery of April, 1905, which is alleged in the complaint, and found by the trial judge on her evidence. She says that she was working in the said house next door of Mrs. Bauer, and she and her husband slept in the rear hall bedroom on the third floor, which was separated by the party wall from the bedroom of the said servant of defendant in his house; that at midnight one night in April, 1905, while her husband was asleep and she awake, she heard the servant say, "Mr. Keville, you have been drinking," and heard him also talking and recognized his voice through the wall, though not his words, so loud was he also talking. She knew it was his voice though she had never talked with him, or heard him speak, except that she had heard him call his children in from his stoop on some previous occasion. This is all bad enough, but when we consider that at that time this plaintiff and her son and daughter were living there with the defendant, what are we to say of it? If this defendant lodged with his servant in her bedroom, and they talked there so loud as to be heard in the next house, were they not heard in his own household?

Of these four witnesses, three are of the household of Mrs. Bauer, and they all admit, as does also the other, the old vegetable vender, that they went to Mrs. Bauer's and there met the plaintiff before this action was begun. Though they told no one else, they seem to have told everything to Mrs. Bauer, and she prepared the case for the plaintiff. Her meddlesomeness is revealed. She and the witnesses actually breathed together, and she could not refrain from being a witness herself, although her testimony is not of particular account.

Moreover, this servant remained in the house until after October 19, 1905, when the defendant left his house on account of disagreements with the plaintiff, i. e., for more than a year after the first alleged adultery, without the plaintiff or any of the household seeing or hearing any impropriety between her and the defendant, much less knowing that he was a visitor or a lodger in the servant's bedroom, and participated in loud altercations there.

If there be a suspicion that the defendant and the servant were too intimate, that does not suffice.

The judgment should be reversed on the law and the facts.

Judgment reversed on the law and the facts, and new trial granted; costs to abide the final award of costs. All concur, but HIRSCHBERG, J., not voting.