## McNEIR v. McNEIR.

(Supreme Court, Special Term, Dutchess County. May 6, 1911.)

1. DIVORCE (§ 129*)—ADULTERY—EVIDENCE.

In an action for divorce for adultery, evidence *held* to show lascivious desire, opportunity, and gratification, and to authorize a finding that defendant was guilty of the offense charged.

[Ed. Note.—For other cases, see Divorce, Cent. Dig. §§ 411–454; Dec. Dig. § 129.*]

2. DIVORCE (§ 99*)—ACTION—PARTIAL DEFENSE.

In an action for divorce by a wife for her husband's adultery, a partial defense alleging various acts and conduct on plaintiff's part, including abandonment, and that, on the occasion of her abandonment and desertion of defendant, she consented to defendant's cohabiting with other women during her willful desertion of defendant and willful absence from his bed and board, and that such willful desertion, abandonment, and absence continued throughout the whole period of the alleged pretended acts of adultery with the corespondent alleged in the complaint, was insufficient.

[Ed. Note.—For other cases, see Divorce, Dec. Dig. § 99.*]

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

3. DIVORCE (§ 298*)—CUSTODY OF CHILDREN—RIGHT OF WIFE.

Where a wife is entitled to a divorce for the husband's adultery, she has an absolute right to the custody of the children, unless their welfare requires a different disposition.

[Ed. Note.—For other cases, see Divorce, Cent. Dig. §§ 781–787; Dec. Dig. § 298.*]

4 DIVORCE (§ 298*)—CUSTODY OF CHILDREN—RIGHT OF WIFE.

Complainant at the time of her suit for divorce was the mother of two girls of two and four years, respectively, born to her within 16 months of each other. She was not a robust woman prior to separation, and left the children in charge of a nurse, while she and her mother went to a resort with the husband's approval for her health. *Held*, that such fact, and that the baby was not bathed but once a day, and was occasionally put to bed without its clothes loosened or removed, was no reason for refusing to award the custody of such children to her on her securing a divorce for her husband's adultery.

[Ed. Note.—For other cases, see Divorce, Cent. Dig. §§ 781–787; Dec. Dig. § 298.*]

Action by Ailene Ely McNeir against Burrows McNeir. Decree for complainant.

C. W. H. Arnold (W. H. Wood, of counsel), for plaintiff.
Daniel Gleason (Seldon Bacon, of counsel), for defendant.

MORSCHAUSER, J. This action is for an absolute divorce, and the complaint is in the usual form in matrimonial actions.

The adultery charged was that between March 1, 1910, and July 1, 1910, in the Paul Jones apartment house, 184th street and Wadsworth avenue, New York City, with a woman known as Miss Andrews or Grace Walton, or Grace De Ròda or Mrs. De Roda, and that defendant lived in adulterous intercourse with her in this apartment during this time. There was a charge of adultery with another woman, but upon the trial this was abandoned. The answer denies the adultery, "and denies that the pretended adulteries alleged in the complaint, or any thereof, were committed either with or without either the consent, connivance, privity, or procurement of the plaintiff." The defendant pleads as a partial defense and counterclaims various acts and conduct on the part of the plaintiff, and, as to her abandonment and in the sixth paragraph such partial defense sets forth as follows:

"That upon the occasions of her said several willful abandonments and desertions of defendant, and thereby the plaintiff consented to defendant's cohabiting with other women, during her willful desertions of the plaintiff, and with willful absence from his bed and board; that such willful desertion, abandonment, and absence continued throughout the whole period of the pretended acts of adultery with the woman mentioned as Grace Andrews or Grace Walton in the complaint therein alleged."

The defendant also alleges neglect of plaintiff as to the care of the children, the issue of the marriage. There was a reply denying the various allegations set forth in the answer. The partial defense interposed by defendant is insufficient. The counterclaims alleged in the answer must fail.

[1] The proof shows that the plaintiff is entitled to succeed. A witness for plaintiff (Frederick Coysh) testified that he did not at first

know the name of the defendant when he first came to the house, but learned his name toward the latter end; that he recognized the photograph shown him as the woman that had lived there under the name of Mrs. Andrews; that he had seen the defendant come to the apartment at 2 in the afternoon and 11 o'clock at night, and, when the witness went to bed, defendant's automobile was still at the door; that he had seen the defendant and Mrs. Andrews go out together in an automobile; that the defendant stopped coming to the apartment around the 1st of May; that witness had had a conversation with the defendant about his motorcycle being in the front hall, and defendant came down from the apartment in his shirt sleeves and removed it; that two or three days before defendant left the apartment he met the witness in the main hall, and the defendant passed him a dollar and told witness, "if any body should ask for him, not to know his whereabouts." Witness when in the apartment of Mrs. Andrews saw only one brass bed, and later a couch was delivered to the apartment, and that he did not know to whom it belonged, and he asked a boy working with him about it, and defendant, being near, remarked that "it belonged to Mrs. Andrews."

Another witness for the plaintiff (Jesse Franklin) testified that he recognized a photograph shown him as Mrs. Andrews; that a party had called on the telephone for Grace Walton, the witness connected the apartment of Mrs. Andrews, and she talked. Witness said: That this woman went out of the apartment and left the key with him, and was told to give it to Mr. Andrews when he returned (indicating the defendant), and defendant took the key and witness went with him up in the elevator to her apartment. It would happen two or three times a week that witness took him up to the apartment. That defendant would come to the house some days at 11 a. m. and some days at 3 p. m. and would leave the apartment about 12 or 1 o'clock at night. That he had brought him down in the elevator mornings more than once when working nights at 6, 8, and 11 o'clock at night, and as early as 7 or 7:30 in the morning. That, when he took him up in the evening, he was sure that defendant stayed there all night, and that defendant did not come down until the next morning. Witness had seen them go out in an automobile at 9 p. m. and return at 1 p. m., and witness would take them both up in the elevator, and from the elevator see them go into the apartment of Mrs. Andrews. That defendant had stated to this witness, "if any one should ask for a gentleman looking anything like him, to say that he had never seen him in the house."

Another witness, janitor of an apartment house (Harry Artens), testified that he recognized the defendant in court as the person who came to him inquiring about some apartments, and that he was accompanied by a lady (recognizing a photograph of Mrs. Andrews); that the apartment he showed them did not suit them, and witness asked defendant if he had a large family, and defendant replied, "No; only myself and wife."

Another witness, a clerk in a hotel (Joseph Estherson), recognized a photograph of Mrs. Andrews as a woman known to him as Mrs. E. T.

De Roda, also as Grace Walton, who lived at the hotel with her husband, a Mr. De Roda, in February. He had seen the defendant around the hotel, but not with Mrs. De Roda, but he had seen him with her elsewhere.

Another witness for the plaintiff, employed in the same apartment with Mr. Artens (Warren Briggs), testified that the defendant and a woman (recognizing a photograph of Mrs. Andrews) came to the apartment and inquired of the superintendent for rooms, and that, when the lady came back, there was brought to the apartment a brass bed and some other furniture, and witness heard defendant say to the janitor, "If any furniture comes C. O. D., to pay for it," and the defendant would pay the janitor, and subsequently he saw the defendant pay the janitor some money. On one occasion when furniture came, it was to be sent back, but the defendant came down from her apartment, and said "It is for us," and then the furniture was taken to the apartment occupied by Mrs. Andrews. When this witness was employed as elevator man, during the time that he testified that he had taken the defendant up to her apartment quite often between the hours of 10 in the morning and 2 and 3 o'clock in the afternoon, and when on nights had taken defendant up all hours after 6 p. m. to 2 a. m. in the morning, and had taken him down from her apartment when working days about 11 a. m., on a particular morning witness took the defendant up to her apartment at 3 o'clock, and that he had not come down up to the time the witness went off duty at 8 a. m. This witness went to her apartment with the telephone operator about a dispute over a telephone message, and that defendant came to the door and took the memorandum of the call, and asked Mrs. Andrews to come to the door and see about it. This was about 6 o'clock in the evening, and the defendant had his coat and collar off. Witness saw Mrs. Andrews' head at the door, and afterwards defendant went back into her apartment and closed the door. This witness had been in the apartment of Mrs. Andrews, and had seen only one brass bed there. An automobile came one night about 11 p. m. and a young man came in and asked if a party lived there by the name of Mrs. Smith, and witness told him, "No." Meanwhile the defendant came in and asked witness what the man wanted, and witness told him the man was inquiring for a Mrs. Smith, and defendant said, "Are you sure he did not ask for any one else?" Then afterwards witness took the defendant up to the apartment of Mrs. Andrews, and instantly defendant telephoned to the police station. Witness further testified that, in reply to a question addressed to him by the defendant, "Did she come in after I went away?" witness replied, "No; Mr. Andrews," and defendant said his name was not Mr. Andrews, but McNeir, and, "Here is a dollar for you. If any one asks you if I have been around here, you know nothing about me, and you have never seen me around this apartment." And this was the first time the witness had heard his name was McNeir, as he was the gentleman that came to the apartment with Mrs. Andrews. Mrs. Andrews would often go out and leave a message for the defendant which the witness would give to him.

Another witness, the telephone operator in the apartment (Alberta Blumenthal), testified that she had seen the defendant at the apart-

ment and often go up in the elevator; that defendant had given this witness money and told her, "If any one came and asked about him, or described him, to say that she had not seen him."

The witness (Frederick Coysh), recalled, said that defendant did not come to the apartment much after the month of May, and that he had seen the defendant come out of the apartment at 11 o'clock in the morning.

A witness for the defendant on direct examination (Bernard Seltz) testified that he had seen the defendant come to the apartment two or three times a week during the month of April and up to the 15th of May, that defendant came in at 4 p. m. and again at 9 p. m., and that he had seen the defendant go out of the apartment at 1 o'clock at night.

Another witness for the defendant on direct examination (Louis Epstein) testified that he had seen the defendant there at the apartment on several occasions; that the defendant would come there at about 4 p. m., and he also identified a photograph shown him as that of Mrs. Andrews, who was a tenant in the apartment.

The corespondent was not a friend or an acquaintance of the plaintiff's or defendant's family, and there was no relation, social or otherwise, between the corespondent and the plaintiff's family or the defendant's family. The defendant is now engaged in farming, and earns about $10 a week. While he and the plaintiff lived together he was a member of the New York Stock Exchange.

The defendant is a strong, healthy, vigorous young man. He appeared at the trial, but was not sworn. Neither was the corespondent called. From the photograph introduced in evidence it appears she was a young and attractive woman. I do not mean to have it inferred that I am indulging in any inferences, because the defendant or the corespondent were not called. I recognize the rule as laid down by Mr. Justice Jenks in Kerr v. Kerr, 134 App. Div. 141–143, 118 N. Y. Supp. 801, 802:

"It is true that the defendant did not testify as to these alleged occurrences. Elliott on Evidence, § 227, says: 'The failure of the party himself to testify may also have the same effect as the failure to call other witnesses; but mere inaction when action is not required, as for instance until his opponent has sustained the burden of proof where it rests upon him, is not an admission, and will not justify an adverse inference.'" Shotwell v. Dixon, 163 N. Y. 43, 57 N. E. 178.

Before the plaintiff is entitled to a decree, there must be established that the defendant had a lascivious desire, the opportunity to gratify it, and that he did gratify it. Auld v. Auld (Super. Ct.) 16 N. Y. Supp. 807. The charge of adultery is easy enough to make, and still it is very difficult at times to prove. The charge must be proved by clear, positive, and satisfactory evidence, and yet being a crime of darkness and secrecy, wherein the parties are rarely surprised, it may and ordinarily must be proved by circumstantial evidence. The rule to be applied in cases of this kind is laid down in Allen v. Allen, 101 N. Y. 658, 659, 5 N. E. 341, 342:

"We understand the rule to be that in civil actions the fact of adultery may be proved by such facts and circumstances as under the rules of law are

legal evidence admissible in a court of justice which clearly satisfied the mind of the tribunal which is required to pass upon the question of the commission of the act. In weighing the evidence and considering the facts and circumstances, great care is necessary, on the one hand, not to be misled by circumstances reasonably capable of two interpretations into giving them an evil rather than an innocent one, nor, on the other, by refusing to give them their plain and natural significance on the theory that a different standard of judgment applies to such cases from that which in ordinary transactions guides the conclusions of intelligent and conscientious men. The circumstances must be considered separately, and also as a whole. The single threads of circumstance may be weak, but united they often lead, with assured conviction, to the final fact which is the subject of the investigation." Williams v. Williams, 1 Hagg. Cons. 290; Durant v. Durant, 1 Hagg. Ecc. 748; 2 Greenl. Ev. §§ 40, 41.

So in this case the acts and the conduct of the defendant, as well as all the circumstances, must be considered in arriving at a determination, and I have kept in mind the just rule that, where the evidence is just as consistent with an innocent interpretation as with a guilty one, I should adopt the former interpretation in preference to the latter. I recognize the serious consequences of a judgment of divorce, and that it should be granted only upon evidence which absolutely justifies such an act.

In the determination of his case, I have carefully scrutinized and analyzed the evidence, and I have endeavored to be prudent and cautious, as the defendant was not caught in the direct act of illicit intercourse. This is not necessary. If upon all the evidence in the case it leads to the irresistible conclusion that such illicit intercouse has taken place, the court will be justified in finding it. All the acts and conduct of the defendant and the circumstances in connection with the relation of this Andrews woman are all consistent with the theory that the defendant had illicit intercourse with her, and no other reasonable or sensible conclusion could be reached, unless we shut our eyes to the acts and conduct of individuals for the purpose of finding an excuse for such acts and conduct. All the defendant's acts, all his conduct, and all the circumstances are linked so consistently and firmly together as to satisfy the most doubtful mind that the charge has been sustained. Circumstances standing alone might have very little weight, but, when all the circumstances and facts and the acts and conduct of the defendant are grouped together, it can lead but to one conclusion, that the charge has been established by convincing proof.

As was said by Mr. Justice Earl in Moller v. Moller, 115 N. Y. 468, 22 N. E. 169:

"But the illicit amours of faithless husbands and wives are usually clandestine, and their wicked paths are hidden from public observation; and hence courts must not be duped, and they must take such evidence as the nature of the case permits, circumstantial, direct, or positive, and bringing to bear upon it the experience and observations of life, and thus, weighing it with prudence and care, give effect to its just preponderance."

Kerr v. Kerr, 134 App. Div. 141, at page 142, 118 N. Y. Supp. at page 801, was a case where a man met a woman at a railroad station. He took her to a hotel where he registered both her and himself under an assumed name as husband and wife, and had a room assigned to them upstairs in the hotel. He immediately ascended with her in a

lift as if to the room, taking their baggage with them, and was not seen to come down before midnight, and it was held sufficient to justify an interlocutory decree of divorce. Such evidence showed inclination as well as opportunity. Said the learned Justice Gaynor:

"By seeking such bedroom privacy was evidence of inclination stronger than any ordinary act of affection between them at the station or in the cab. What did they register in a hotel as man and wife and retire to a bedroom for? We have it of old: 'It is presumed he sayeth not a paternoster' there."

Said Mr. Justice McAdam in Auld v. Auld (Super. Ct.) 16 N. Y. Supp. 804:

"Married women should not only avoid evil, but the appearance of it, and if, by their course of conduct with other men, they give color to charges of misconduct, and commit acts of indiscretion and impropriety which tend to evidence them, they must not complain if the public draw the conclusion which seems inevitable, that the marriage vows have not only been forgotten, but broken."

I believe this rule of conduct applies to men as well. The learned counsel for the defendant cites Pollock v. Pollock, 71 N. Y. 137, 144, 145; Burch v. Burch, 80 App. Div. 55, 80 N. Y. Supp. 182; Keville v. Keville, 122 App. Div. 388, 106 N. Y. Supp. 993; Kerr v. Kerr, 134 App. Div. 141, 118 N. Y. Supp. 801; Hutchinson v. Hutchinson, 53 Misc. Rep. 438, 104 N. Y. Supp. 1074; and other cases in his brief in support of his argument that the evidence does not justify a finding against the defendant of adultery. While some of the facts and circumstances in the Pollock and Hutchinson Cases are similar to this case, yet the relations of the parties, their condition in life, and their acts and the circumstances show the distinguishing features in the case at bar.

In the Pollock Case the plaintiff and the corespondent were shown to be together at the plaintiff's place of business, and people went in and out frequently, and other females went in and out of this place. A boy was employed there and a woman who did the housework resided there. And the occupation of the corespondent was open to observation of all these persons. She was always at work painting photograph pictures, and had always been in the employ of the plaintiff since she was 14 years of age. Her relations were those of a dependent and in some degree a servant. Her occupation took her to her employer's rooms daily. She denied the adultery, and also explained about her being there on Sunday night. There was no inclination shown in the Pollock Case or facts from which it could be inferred; at most opportunity was shown.

In the Hutchinson Case it was shown that the defendant for a year and a half was a frequent visitor at the apartment of the corespondent, an unmarried woman; that he visited her apartment on an average of twice a week, frequently taking meals at her table and often spending the evenings in her home; and that on five or six occasions while the corespondent's nephew, who lived with the corespondent, was present, he slept in her apartment. Although the defendant's own family resided in the neighborhood, they appear to have been entirely unaware of the existence of the corespondent, notwithstanding the intimacy which so long existed between her and the defendant. The evidence

on the part of the defendant shows that his intimacy with the corespondent grew out of friendship of many years standing. The defendant attempts to explain his constant attendance at the corespondent's house on the ground that he was experimenting in her rooms with a new kind of gas burner, and that, being a sufferer from diabetes, he was served at intervals at the corespondent's house with food specially prepared for victims of that disease. Considerable testimony was introduced tending to show that the defendant was known among the janitors and servants in the apartment house of the corespondent as her husband. Mr. Justice Blanchard in that case refused the decree, because the evidence failed to establish satisfactorily the inclination of the defendant toward adulterous conduct. In the case at bar the facts and circumstances and the acts and conduct of the defendant are clearly distinguishable. Each case, however, must be decided upon the facts and circumstances as they appear; and, while in one case the facts and circumstances would not justify a judgment, still a very few changes in the facts will authorize a judgment.

[2] Having disposed of the question of adultery, I now take up the question seriously urged by the learned counsel that, although if the adultery is proved, still there can be no divorce because of the abandonment by the plaintiff. In justification of this claim he cites various cases from other jurisdictions that he urges would justify him in asking that it be applied in this case. He also calls attention to the case of Richardson v. Richardson, 114 N. Y. Supp. 912. In that case no authorities are cited.

In that case the referee recommended the refusal of the decree, but it cannot be said that he did it upon the ground of abandonment of the plaintiff alone, for he recognized the rule that the statute made it obligatory upon her seeking a divorce for adultery to prove that the adultery was without her consent, connivance, privity, or procurement, and that the existence of either condition was sufficient to defeat the granting of a decree. The referee said at the end of the case:

"Step by step from the commencement of the hearing I have become more and more impressed with doubts as to the bona fides of this action until after its close, and after a careful review of the testimony, I have become firmly convinced that this action is collusive."

If adultery is committed with consent, connivance, privity, or procurement, the party seeking a divorce is not entitled to it. Let us review a few cases which have treated upon this subject in this and other jurisdictions.

In Diddell v. Diddell, 3 Abb. Prac. 167, it was held that abandonment was no defense in an action for divorce based upon adultery. The answer set up cruel treatment and abandonment and neglect to provide. This was stricken out on motion. This case was followed in Griffin v. Griffin, 23 How. Prac. 183, where it was held that abandonment or cruel and inhuman treatment was no defense. The Diddell Case was decided in 1856, the Griffin Case in 1861.

In Bast v. Bast, 82 Ill. 584, Mr. Justice Breese says:

"The grounds alleged for reversing the decree in this case are that the decree is not sustained by the evidence, and that appellee himself has deserted

his wife, giving her the right to claim a divorce from him. We do not think his desertion can exonerate the wife from the more serious charge of adultery."

In Huling v. Huling, 38 Ill. App. 144, in an action by the wife against the husband, the court said:

"The single question presented by this record is whether desertion set up by way of recrimination is a good answer to a bill for a divorce charging adultery; and, although the rulings upon it elsewhere seem to be variant, we think that for this state it is decisively answered in the negative by the case of Bast v. Bast, 82 Ill. 584."

In Mattison v. Mattison, 60 Misc. Rep. 573, 113 N. Y. Supp. 1024, the action was for adultery, and the answer set up abandonment and acts of cruelty antedating the beginning of the action. The court said:

"Abandonment confers no license on the deserted party to offend against the marital vows."

In the Ecclesiastical Court of England it was held that even a malicious desertion will not bar a sentence for divorce for adultery. Sullivan v. Sullivan, 2 Ecc. 314. By analogy it may be of benefit to cite a few cases where the defense of condonation has been pleaded. In order to sustain legal condonation, there must be a complete knowledge of all the adulterous acts and with that knowledge condonation. Uhlman v. Uhlman, 17 Abb. N. C. 236.

In Reiersen v. Reiersen, 32 App. Div. 62, 52 N. Y. Supp. 509, it was held that where a husband believed that his wife had already committed adultery, and intended to persist in such adulterous practices, he was not guilty of such connivance in her acts as will preclude his taking advantage of it as a ground for divorce where he with intention of obtaining evidence of adultery against his wife does not actively interfere to prevent her commission of the offense under circumstances in which, had he desired to do so, he could have prevented it.

In Harris v. Harris, 83 App. Div. 123, 82 N. Y. Supp. 568, the defendant had been to a hotel with an unknown woman where they had had adjoining rooms. The wife found a receipted bill of the hotel for the defendant and wife for 2½ days in his pocket. With this evidence against him when confronted by the wife, he admitted it, but denied the charge of adultery, and he stated he could not explain the matter at that time, but would do so at some future time, and, although the plaintiff lived with him, it was not a defense, for she had not the full knowledge. As the court said at page 126, 83 App. Div., at page 571, 82 N. Y. Supp.:

"The uniform rule is that some knowledge must exist sufficiently substantial upon which to base a relief; and usually there must be some means of making legal proof of the commission of the offense before condonation will be implied from the cohabitation. Merrill v. Merrill, 41 App. Div. 347–350, 58 N. Y. Supp. 503, and authorities there cited. It cannot be said that the plaintiff had such knowledge at the time she went to live with her husband in Brooklyn in the fall of 1899, although it may be conceded that she had expressed a belief in his guilt. She had the receipted bill, but this without connecting evidence was by no means conclusive. She had also the admission of her husband that he was present at the Hygeia Hotel on the date of the bill, but he denied having been guilty of the act of adultery, and in the

absence of the evidence of the location and surroundings of the rooms to which the defendant and his unknown companion were assigned, and the defendant's misleading letter to his son, the plaintiff as the mother of the defendant's children had a right to rely upon his denial and his promise to make an explanation when he could do so without injustice to his friends."

Said the same learned Justice Woodward in Deisler v. Deisler, 59 App. Div. 207–216, 69 N. Y. Supp. 326, 332:

"The condonation cannot, therefore, be said to have been made of the offense of adultery. This was denied, and, although the defendant knew of the facts which were calculated to make him suspicious, he was not obliged to believe this evidence in the face of the denial of his wife."

See Shackleton v. Shackleton, 48 N. J. Eq. 364–369, 21 Atl. 935, 27 Am. St. Rep. 478.

If adultery is proved, abandonment is not a defense.

At the close of the case the paternal grandfather instituted proceedings by petition joined in by the defendant for the custody of the children. The plaintiff answered petition. The maternal grandmother also filed a petition, joined in by plaintiff. It was stipulated that all the evidence taken in the divorce action as far as applicable should be received in the determination of these issues and were to be disposed of in this action.

[3] Where the wife is entitled to a divorce for the adultery of the husband, she has an absolute right to the custody of the children, unless their good require some other disposition of them. Uhlman v. Uhlman, 17 Abb. N. C. 226; Crimmins v. Crimmins, 28 Hun, 201. The paternal grandfather and grandmother and the maternal grandmother are people of wealth and apparent refinement and culture, and, so far as it appears, these infant children would be well cared for and nurtured by either of them. All have ample means, and are so circumstanced that they are fully qualified to give to the children excellent care and a good education. The reasons advanced why the mother should be deprived of the custody of the children are entirely inadequate to justify the court in interfering in depriving her of their care and custody. Both children are girls of tender years, now two and four years of age, and naturally need the care, affection, and attention of the mother. The complaint against her was that the baby was bathed but once a day, and was occasionally put to bed without the clothes loosened or removed, and she allowed the baby to remain in the custody of a nurse for some time while she went away, and that she made some very unnatural remarks in reference to the children.

[4] She gave birth to these two children within 16 months of each other. She was not a strong, robust woman, and in her condition and under the circumstances she felt that she should go away to recuperate her health. At this time she was living with her husband at Briarcliff, N. Y. She had a nurse who was well recommended to her, and had been in her employ about two weeks, and she also had a cook and a maid who had been in her employ for some time. She went away, leaving the children in charge of the nurse and these two maids. Her brother was also in touch with her household affairs and her children, and communicated with her. She visited Atlantic City with her mother, taking the older child with her. This was with her husband's ap-

proval.  He took her from her home at Briarcliff with her child, and met her mother at the station in New York City.  He gave her money and left her.  She went to Atlantic City, and remained there about two weeks, and, when she returned to Briarcliff, her home, she found the furniture removed and the nurse and baby gone.  She subsequently learned that the child and nurse were with its paternal grandfather, at his residence in New York City, where she visited it.  The baby was afterwards taken to Briarcliff, the summer home of the paternal grandfather, where she again visited it, and where the child has since remained.  Perhaps the plaintiff did not exercise the best judgment in her conduct in leaving these children as she did, but, at most, it was an error of judgment on her part for which she is not to blame.  She was a young, inexperienced woman, and in a nervous condition and in need of recreation, and the best judgment under those circumstances could not be expected.  It is well enough to say here that there was not a breath of suspicion against the plaintiff's morality, or that she was morally unfit to care for these children.  It may be that in her nervous condition she made remarks to the members of her husband's family that did not sound well from a mother.  She is not to be judged by what she said under these trying circumstances.  I believe that the proof establishes that she is a proper and good mother to take care of and nurture and educate the children, instead of establishing the contrary.

The younger daughter, having lived with the paternal grandparents, has endeared herself to·them, and it will be a severe loss to them to take her away, but I must recognize the paramount right of the mother, and yet some provision should be made in the decree that the father, as well as the paternal grandparents, have an opportunity of seeing these children at suitable times and places.  As to the grandmother, it has already been indicated that the plaintiff, being without means, would make her home with her children with her, and no disposition in that respect need be made.

The petitions should be dismissed, without costs.  The plaintiff is entitled to an interlocutory decree of divorce, with costs.  Findings may be settled on notice.